1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AEGEAN MARITIME PETROLEUM S.A.,

Plaintiff,

v.

KAVO PLATANOS M/V, ET AL.,

Defendants.

CASE NO. 2:15-cv-00172-JHC

ORDER GRANTING MOTION TO
DISMISS WITHOUT PREJUDICE

# I

## INTRODUCTION

This matter comes before the Court on Defendant Canpotex Shipping Services, Ltd.'s Motion to Dismiss the Amended Complaint.  Dkt. # 82.  The Court has considered the materials filed in support of, and in opposition to, the motion, the applicable law, and the balance of the case file.  Being fully advised, the Court GRANTS the motion to dismiss without prejudice and grants Aegean leave to file a second amended complaint.  The Court grants Aegean twenty-one (21) days to file this amended complaint.

## II

### BACKGROUND

In 2014, Defendant Canpotex chartered a vessel, the M/V KAVO PLATANOS (Vessel). Dkt. # 82 at 3.  In October 2014, Canpotex contracted with O.W. Bunkers (U.K.), Ltd. (OW) to have 900 metric tons of bunker fuel delivered to the Vessel in Vancouver, Canada.  Dkt. # 79–1. OW then contracted with Plaintiff Aegean Maritime Petroleum S.A. (Aegean) to deliver the bunker fuel to the Vessel.  Dkt. # 79-3.  Aegean delivered the fuel, and the Vessel's Chief Engineer accepted the delivery.  Dkt. # 79-4.  In November 2014, OW declared bankruptcy. Dkt. # 82 at 3.  Aegean sent an invoice to OW for the bunker fuel but never received payment. *Id.*  So Aegean then sent Canpotex a Notice to Pay for $463,050, the cost of the bunker fuel delivery.  Dkt. # 54.  Canpotex did not pay Aegean.

In February 2015, Aegean brought suit against the Vessel *in rem* and against Defendants Canpotex, Indy Maritime SA (the owner of the Vessel), and Gourdomichalis Maritime SA (the manager of the Vessel) to recover for the bunker fuel delivery.  Dkt. # 1.  Soon after Aegean's initial complaint was filed, this Court authorized the arrest and seizure of the Vessel (including all bunkers aboard) and a writ of maritime attachment and garnishment.  Dkt. ## 9, 12.  Based on the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions Rules B, C, and D (Supplemental Maritime Rules), the Court determined that the conditions for an action *in rem* were present.  Dkt. # 9 at 1.  The Court also concluded that a writ of maritime attachment and garnishment was appropriate under Supplemental Rule B.  Dkt. # 12 at 1.  Canpotex then posted $494,013 with this Court as a substitute security to secure release of the Vessel.[1]  Dkt. # 21.

---

[1] This amount includes Aegean's original invoice price and interest.  Dkt. # 21.

ORDER GRANTING MOTION TO
DISMISS WITHOUT PREJUDICE - 2

In May 2015, Canpotex moved to dismiss, transfer, or stay the action.  Dkt. # 34.  This Court granted a stay pending resolution of cases in the Southern District of New York, where similar legal issues were being litigated relating to OW's bankruptcy.  Dkt. # 54.  The Court stayed the case for six years.  During that period, the parties submitted regular status updates. Dkt. ## 55–70.  The "test cases" in the Southern District of New York have since been resolved. They generally hold that under United States maritime law, subcontractors (like Aegean) delivering bunker fuel do not have valid maritime liens over vessels for nonpayment unless they can show that the contractor (in this case OW) was acting as an "agent" of the Vessel to engage specific subcontractors.  *U.S. Oil Trading LLC v. M/V VIENNA EXPRESS*, 911 F.3d 652, 662–63 (2d Cir. 2018).  On facts much like those here, OW was not considered an "agent," so the subcontractor that delivered fuel did not have a maritime lien against the involved vessel. *Clearlake Shipping Pte Ltd. v. NuStar Energy Servs., Inc.*, 911 F.3d 646, 651–52 (2d Cir. 2018); *see also Aegean Bunkering (USA) LLC v. M/T AMAZON*, 730 F. App'x 87, 89 (2d Cir. 2018); *O'Rourke Marine Servs. L.P., L.L.P. v. M/V COSCO HAIFA*, 730 F. App'x 89, 91 (2d Cir. 2018); *Chemoil Adani Pvt. Ltd. v. M/V MARITIME KING*, 742 F. App'x 529, 531 (2d Cir. 2018).

After the Court lifted the stay in December 2021, *see* Dkt. # 70, Canpotex moved to dismiss the case given the new Southern District of New York decisions.  Dkt. # 77.  Aegean then amended its complaint, bringing several claims:

    (1) Under Canadian law, Aegean has an *in rem* maritime lien over the Vessel, and is thus entitled to the substitute security for the unpaid bunker fuel delivery.

    (2) Canpotex breached the terms of its contract with OW—which was subject to Aegean's terms and conditions—by not paying Aegean for the bunker fuel delivery.

(3) Even if no contract terms exist between Canpotex and Aegean, Aegean has a quantum

meruit claim for the substitute security because Canpotex received the benefit of the

bunker fuel and never paid for it.

(4) Under Aegean's terms and conditions, Aegean still has title to the bunker fuel

onboard the Vessel because it was never paid for its delivery.

(5) Under Supplemental Maritime Rule B, this Court should maintain its order of

Maritime Attachment and Garnishment and award Aegean the substitute security.

Dkt. # 79.

In March 2022, Canpotex filed this motion to dismiss Aegean's amended complaint for

failure to state a claim upon which relief can be granted.  Dkt. # 82.

## III

### DISCUSSION

A.     12(b)(6) Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a

claim if it "fails to state a claim upon which relief can be granted."  To survive a Rule 12(b)(6)

motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plaintiffs must plead enough facts that the

court can "draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.*  For Rule 12(b)(6) motions, the court does not accept all legal conclusions in the complaint

to be true, so conclusory statements of law or "formulaic recitation of the elements of a cause of

action" are not sufficient.  *Id.*

ORDER GRANTING MOTION TO
DISMISS WITHOUT PREJUDICE - 4

1

2

B.     Judicial Estoppel

Canpotex argues that the Court should reject Aegean's maritime lien theory based on

judicial estoppel.[2]  Dkt. # 82 at 2.  This, Canpotex says, is because Aegean's new maritime lien

theory—that Canadian law governs the existence of a maritime lien—contradicts the allegations

in Aegean's initial complaint, in which it argued that its lien claim is governed by U.S. law.  *Id.*

Judicial estoppel is an equitable doctrine meant to "protect the integrity of the judicial

process by prohibiting parties from deliberately changing positions according to the exigencies

of the moment."  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).  The court applies judicial

estoppel at its discretion and typically considers, (1) whether a party's later position is "clearly

inconsistent" with its earlier one; (2) whether the court has adopted the party's earlier position,

such that judicial acceptance of a later inconsistent position "would create the perception that the

court was misled"; and (3) "whether the party seeking to assert an inconsistent position would

derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Ah Quin v. County of Kauai Dept. of Transp.*, 733 F.3d 267, 270 (9th Cir. 2013) (quoting *New

Hampshire*, 532 U.S. at 750–51).  In general, judicial estoppel is used to prevent a litigant from

"playing fast and loose with the courts."  *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990).

It is "most commonly applied to bar a party from making a factual assertion in a legal proceeding

which directly contradicts an earlier assertion made in the same proceeding or a prior one."  *Id.*

In its amended complaint, Aegean changes its choice of law theory for its maritime lien

claim.  While Aegean argued before that U.S. law applies to its lien claim, it now argues that

Canadian law governs.  Dkt. # 79 at 8.

---

[2] While Canpotex asserts that Aegean should be "estopped," it does not specify which type of estoppel should apply.  Nor does it cite any legal authority.  The Court interprets Canpotex's briefing as requesting judicial estoppel.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The Court concludes that judicial estoppel should not apply.  Despite the multi-year delay in proceedings generated by the stay, this case is still in its procedural infancy: The Court is considering a motion to dismiss following Aegean's first amendment to its complaint.  *See* Dkt. # 82; Dkt. # 79.  At such an early stage, parties are entitled and encouraged to modify, hone, and refine their factual and legal theories.  The parties have not engaged in extensive discovery, nor is Aegean shifting its legal theory on the eve of trial.

A federal district court in California denied a motion to dismiss because a change in legal theory between the plaintiff's original and amended complaint did not justify application of the judicial estoppel doctrine.  *Regents of the Univ. of Cal. v. Aisen*, CASE NO. 15–cv–1766–BEN (BLM), 2016 WL 4097072 (S.D. Cal. Apr. 18, 2016).  The court concluded:

> Rather than forcing a party to continue litigating a theory it no longer wants and preventing the abandonment of weak claims, courts ought to encourage the paring away of flawed claims.  *See* Fed. R. Civ. P. 1 (Rules to be construed to secure the just, speedy, and inexpensive determination of cases).  In any event, the plaintiff is master of its complaint, it is early in the proceedings, and this Court will not employ its discretion to preclude [plaintiff] from discarding its earlier claimed violation of the federal Copyright Act.  *Intergen N.V. v. Grina*, 344 F.3d 134, 145 (1st Cir. 2003) ("An amended complaint supersedes the original complaint, and facts that are neither repeated nor otherwise incorporated into the amended complaint no longer bind the pleader.  Absent some sign of unfair advantage . . . the mere retraction of statements made in an original complaint does not justify the invocation of judicial estoppel.").

*Id.* at *3.

Moreover, the Federal Rules of Civil Procedure expressly permit parties to plead in the alternative, allowing them to assert plainly inconsistent positions.  Fed. R. Civ. P. 8(a)(3) ("[P]leading that states a claim for relief . . . may include relief in the alternative or different types of relief); Fed. R. Civ. P. 8(d) ("A party may set out 2 or more statements of a claim or defense alternative or hypothetically, either in a single count or defense or in separate ones . . . A party may state as many separate claims or defenses as it has, regardless of consistency."); *see*

*also PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 858–59 (9th Cir. 2007) ("[W]e allow pleadings in the alternative—even if the alternatives are mutually exclusive."). Therefore, even though the positions taken in the two complaints are clearly inconsistent—one asserting that the lien claim is governed by U.S. law, the other asserting that the lien claim is governed by Canadian law—Aegean may adopt such inconsistent positions at the pleading stage.

Several other factors influence the Court's conclusion. First, accepting Aegean's new position would not create the impression that the Court was misled by Aegean's original position. *See New Hampshire*, 532 U.S. at 750 ("[C]ourts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that . . . [the] court was misled." (internal quotation marks and citation omitted)); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001) ("This court has restricted the application of judicial estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent position."). The Court never "accepted" Aegean's initial position. Aegean previously pleaded a maritime lien under U.S. law, but the Court never adjudicated that claim or relied on it. The integrity of the judicial process has not been damaged by Aegean's shift in legal theory.

Second, Aegean did not seek the stay; Canpotex did. *See* Dkt. # 34. In fact, Aegean opposed the stay. *See* Dkt. # 41 at 7. Thus, any delay here was induced by Canpotex, and the only prejudice it now suffers is the obligation to respond to a new complaint with a new legal theory. At the motion to dismiss phase of proceedings—before any meaningful discovery has occurred, before trial is scheduled, and during a phase of litigation in which parties regularly alter and refine their legal theories—responding to a new legal theory is not prejudicial enough to justify estoppel.

C.      Breach of Contract

        Aegean asserts a breach of contract claim.  Aegean alleges that Canpotex breached its

contract when it failed to pay Aegean for the bunker fuel delivery.  Dkt. # 79 at 9.  The amended

complaint does not contend that there is a formal and direct contract between Aegean and

Canpotex; none seems to exist.  Instead, Aegean's breach of contract claim relies on a theory

something like this: Canpotex signed a contract with OW.  The Canpotex-OW contract contains

a provision—Clause L.4—that purportedly "incorporates" Aegean's terms and conditions into

OW's terms and conditions.  This, Aegean says, brings Canpotex into contractual privity with

Aegean.  Clause L.4 states:

> L.4(a) These Terms and Conditions are subject to variation in circumstances
> where the physical supply of the Bunkers is being undertaken by a third party
> [Aegean] which insists that the Buyer [Canpotex] is also bound by its own terms
> and conditions. In such circumstances, these Terms and Conditions shall be varied
> accordingly, and the Buyer shall be deemed to have read and accepted the terms
> and conditions imposed by the said third party.
> . . . .
> (iii) A different law and/or forum selection for disputes to be determined, then
> such law selection and/or forum shall be incorporated into these terms and
> conditions.

Dkt. # 79 at 4.[3]   In other words, Aegean argues that if it "insist[ed]" that its terms and conditions

apply, then the OW-Canpotex contract is "varied" to incorporate Aegean's terms and conditions.

Aegean's terms and conditions, in turn, contain choice of law and forum selection clauses that

point to Greek law and Greek courts, respectively.[4]  Dkt. # 82 at 15.

_____

[3] OW's terms and conditions also state that the agreement "shall be governed and construed in
accordance with English law."  Dkt. # 82 at 12.

[4] The contract provision at issue states in full:

Except as otherwise expressly agreed to in writing, the Agreement its performance and
enforcement is governed by the Greek Law. All disputes arising in connection with this
agreement or any agreement resulting hereof shall be referred to the Courts of Piraeus.
For the sole benefit of the Seller [Aegean], it is further agreed that the Seller may proceed
against the Buyer [OW], any third party [Canpotex] or the vessel in such jurisdiction as

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

There are three fundamental problems with Aegean's breach of contract claim.  First, there does not appear to be a direct contract between Aegean and Canpotex (nor does the amended complaint assert that there is one).  A breach of contract claim cannot be sustained without the existence of an enforceable contract.  *See Shelter Forest Int'l Acquisition, Inc. v. COSCO Shipping (USA) Inc.*, 475 F. Supp. 3d 1171, 1181 (D. Or. 2020).   Even if Clause L.4 operated by "vary[ing]" the OW-Canpotex contract to include some of Aegean's terms (say, incorporating Aegean's choice of law provision), it is not clear that this would create a direct contract between Aegean and Canpotex such that Canpotex could "breach" that contract. Though the parties have not thoroughly briefed the issue, a reasonable interpretation of the L.4 provision is that it merely varies the terms of the OW-Canpotex relationship; it does not necessarily create a contract between Aegean and Canpotex when one does not otherwise exist.

Several Southern District of New York decisions are instructive.  Analyzing nearly identical contractual relationships, the court concluded that a physical supplier could assert a breach of contract claim only against the party with which it had directly contracted.  *ING Bank N.V. v. Temara*, 203 F. Supp. 3d 355, 370 (S.D.N.Y. 2016), *aff'd sub nom. ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511 (2d Cir. 2018) ("CEPSA cannot assert that any entity other than OW USA breached a contractual obligation it owed to CEPSA.  A breach of contract claim will not lie without an underlying contract, and as a result CEPSA's *in personam* claim against ING must be dismissed.").  While the court did not specifically discuss the effect of the L.4 provision on the breach of contract claim, nothing in the

---

the Seller in its sole discretion sees fit, inter alla [sic], for the purpose of securing payment of any amount due to the Seller from the Buyer.

Dkt. # 82 at 15.

decision suggests that the existence of the L.4 provision somehow created a contract when there otherwise was not one.  And another Southern District of New York decision rejected Aegean's argument that Clause L.4 "creates a direct contractual relationship between the vessel interests and Aegean," concluding that this interpretation was "fundamentally incorrect."  *Aegean Bunkering (USA) LLC v. Amazon* 2016 WL 4471895, at *12 (S.D.N.Y. Aug. 24, 2016), *aff'd sub nom. Aegean Bunkering (USA) LLC v. M/T AMAZON*, 730 F. App'x 87 (2d Cir. 2018).

Second, even if Clause L.4 could create a direct contractual relationship between Aegean and Canpotex, Aegean's amended complaint fails to plausibly allege that it "insist[ed]" that its terms apply.  Several courts have considered the meaning of "insist[]" in the context of Clause L.4.  In *Aegean Bunkering (USA) LLC v. Amazon*, the Southern District of New York extensively analyzed Clause L.4.  2016 WL 4471895, at *12.  In that case, Aegean asserted (as it does here) that Clause L.4 "sweeps all of the Aegean / Hess Terms and Conditions into the contract between Dynacom and OW Malta and creates a direct contractual relationship between the vessel interests and Aegean."  *Id.* at *12.  The court held that Aegean's interpretation of the contract was "fundamentally incorrect."  *Id.*  The court noted that another provision—Clause A.3—states that "[g]eneral trading conditions of another party will not apply, unless expressly accepted in writing by OWB."  Clause A.3—reflecting the parties' intent to allow contract modification only after acceptance in writing—arguably conflicts with a loose definition of "insistence."  In light of that provision, other terms in the contract, and the general structure of the contract, the court concluded that Aegean had not sufficiently "insist[ed]" that its terms and conditions apply.  The court stated that "the condition that terms be 'imposed' requires more than those terms simply being referenced as applicable," and instead requires that the supplier "specifically referenced and obligated the Buyer."  *Id.*

Similarly, in *NCL (Bahamas) Ltd. v. O.W. Bunkers USA, Inc.*, the Second Circuit concluded that the contract (and Clause L.4) should be interpreted under English law.  745 Fed. App'x 416, 419 (2d Cir. 2018).  The court then evaluated whether, under English law, a subcontractor (EKO) for delivery of bunker fuel to a vessel sufficiently "insisted"—per the language of Clause L.4—that its terms applied to the vessel's charterer (NCL).  *Id.*  The Second Circuit vacated the district court's ruling that EKO insisted its terms and remanded the case on the insistence issue.  The court concluded that mere awareness of the supplier's terms and conditions was not sufficient to satisfy the insistence requirement.

And in Cockett v. ING & OWB [2019] EWHC (Comm) 1533, [39]–[48] (Eng.), the English High Court rejected a physical supplier's contention that it sufficiently "insisted" that its terms apply.  *See* Dkt. # 83-2 (copy of Cockett decision).  The High Court found that there was nothing to suggest that the physical supplier insisted anything directly to the vessel or its officers. *Id.* at 12–13.  It may have made insistence upon OW (the direct contractual counterparty), but not to the vessel or others associated with the vessel.  *Id.*  And without insistence to those other parties (such as the "Buyer" in OW's terms of service), Clause L.4 did not vary the terms of the contract.  This case is particularly relevant because the OW terms state that the contract must be interpreted under English law.  Dkt. # 82 at 12.

Under the reasoning in *NCL*, *Aegean*, and Cockett, the complaint fails to plausibly allege that Aegean affirmatively insisted that Canpotex adopt its terms and conditions.  Aegean cites several documents as reflecting insistence:

> (1) A message from Aegean to OW that lists Defendants as Buyers and states, "Seller's terms and conditions to apply," Dkt. # 79–3;

> (2) The Sales Order Confirmation form from OW to Canpotex listing Aegean as the supplier of the bunker fuel, Dkt. # 79–1;

ORDER GRANTING MOTION TO
DISMISS WITHOUT PREJUDICE - 11

(3) A message to Canpotex and the Vessel listing Aegean as the supplier of the fuel, Dkt # 79–2; and

(4) Aegean's delivery receipt, which was signed by the Chief Engineer of the Vessel and states that the charterer will be jointly and severally liable for payment and that all disputes will be settled in Greece.  Dkt. # 79–4.

But most of these documents suggest only that Aegean insisted to OW, or that Canpotex may have known that Aegean would serve as the physical supplier for OW.  This is not enough to demonstrate insistence.  None of the documents plausibly suggest that Aegean affirmatively notified Canpotex directly and affirmatively insisted to Canpotex that it be bound by Aegean's terms.

Third, even if a Clause L.4 creates a direct contractual relationship between Aegean and OW, and even if Aegean adequately "insist[ed]" that its terms apply, Aegean fails to confront the fact that its own terms provide for application of *Greek* law, not Canadian law.  Aegean fails to explain whether it would be entitled to relief—either on a lien theory or a contractual theory— under Greek law.

As a final note, Aegean's complaint seems to assert, without elaboration, that its contract claim arises through "the agency of OWB."  Dkt. # 79 at 9.  Aegean does not explain this assertion in the complaint and does not mention it in its Response brief.

Accordingly, the Court dismisses this claim without prejudice.

D.     Maritime Lien

Under Supplemental Maritime Rule C, an *in rem* action may be brought in a United States court "to enforce any maritime lien."  Maritime liens are long-held traditions of law, and they give a creditor who maintains a debt related to a vessel "the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds of the sale."  *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1128 (9th Cir. 2008).  Maritime liens thus serve the

1  "dual purpose of keeping ships moving in commerce while not allowing them to escape their

2  debts by sailing away." *Id.* (quoting *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th

3  Cir. 1986)).

4       Maritime liens are *stricti juris*, and they can be created only through an operation of

5  law—like a statute—and not by a contract.  *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*,

6  892 F.3d 511, 519 (2d Cir. 2018).  Without any contractual choice of law provision, courts

7  generally weigh seven non-exclusive factors to determine which country's law applies: (1) the

8  place of the wrongful act; (2) the law of the flag; (3) the allegiance of the defendant shipowner;

9  (5) the place of contract; (6) the inaccessibility of a foreign forum; and (7) the law of the forum.

10 *Lauritzen v. Larsen*, 345 U.S. 571, 583–91 (1953); *see also Trans-Tec*, 518 F.3d at 1124

11 (applying the *Lauritzen* factors in a maritime lien case); *Gulf Trading & Transp. Co. v. M/V*

12 *Tento*, 694 F.2d 1191, 1194–95 (9th Cir. 1982).  When there is a contract but no choice of law

13 provision, the court also considers factors in § 188 of the Restatement (Second) of Contract of

14 Laws, including "the place of negotiation of the contract, the place of performance and the place

15 of business of the parties."  *Gulf Trading & Transp. Co. v. The Vessel Hoegh Shield*, 658 F.2d

16 363, 366–67 (5th Cir. 1981); *see also Trans-Tec*, 518 F.3d at 1124.  Generally, "courts should

17 weigh and evaluate all relevant points of contact between the transaction and the sovereign legal

18 systems that are affected by it, and not simply run through a mechanical analysis of the *Lauritzen*

19 factors."  *Trans-Tec*, 518 F.3d at 1124.

20       In its amended complaint, Aegean brings a maritime lien claim under the Canadian

21 Marine Liability Act § 139 (S.C. 2001, c. 6), which states: "A person, carrying on business in

22 Canada, has a maritime lien against a foreign vessel for claims that arise . . . in respect of goods,

23

24

ORDER GRANTING MOTION TO
DISMISS WITHOUT PREJUDICE - 13

materials or services wherever supplied to the foreign vessel for its operation or maintenance."[5]
Aegean argues that Canadian law governs its maritime lien claim because (1) Aegean was
operating through its Canadian operation; (2) Aegean provided bunkers to the Vessel in Canada;
and (3) Canpotex is a Canadian corporation. Dkt. # 84 at 3.  Canpotex argues that Aegean has
not sufficiently explained why Canadian law applies. Dkt. # 85 at 2.

To assess Aegean's maritime lien claim, the Court must first determine which law
governs.  As discussed above, if Aegean's terms apply to Canpotex, then Greek law may govern
Aegean's maritime lien claim.  But at this stage, the Court does not believe that Aegean's terms
apply to Canpotex.  With no contractual choice of law provision, the Court applies the factors
provided in *Lauritzen* to decide the choice of law question.  *See Trans-Tec*, 518 F.3d at 1124.
Neither party addresses the *Lauritzen* factors in their briefing.

Based on the facts alleged in the complaint and the briefing provided thus far, the Court
is unsure whether Canadian law applies to Aegean's lien claim.  While Canpotex is a Canadian
corporation and the Vessel was docked in Vancouver, Canada when Aegean delivered the fuel,
*see* Dkt. # 84 at 3, the complaint lacks critical facts necessary to determine whether—under the
*Lauritzen* factors—Canadian law applies.  While there are several points of contact with Canada,
there are also points of contact with Greece (Aegean's corporate citizenship), the U.K. (OW's
corporate citizenship), and the United States (where the Vessel was arrested in district).  Dkt.
# 79 at 2–3.  While the Court cannot rule out the applicability of Canadian law to the lien claim,
it cannot confidently conclude at this stage what nation's law applies.  The complaint provides
only a conclusory statement that Canadian law applies, without explaining the basis for this

---

[5] In its amended complaint, Aegean also asserts that its maritime lien over the Vessel is created by a clause in its terms and conditions.  Dkt. # 79 at 5.  However, in Aegean's response brief, it abandons the contractual maritime lien theory, presumably in recognition of the fact that maritime liens cannot be created by contract.  Dkt. # 84 at 4–5.

conclusion or providing essential facts necessary for the *Lauritzen* test.  As this change in applicable law is the crux of Aegean's amended complaint and it is not sufficiently briefed, the Court finds that dismissal without prejudice is appropriate.  In any future pleadings or briefing, the parties should carefully consider both (1) whether Canadian law applies, and (2) if so, whether Aegean would be entitled to a maritime lien under Canadian law.[6]

E.      Unjust Enrichment/"Quantum Meruit"

Aegean purports to bring a "quantum meruit" claim against Canpotex.  Dkt. # 79 at 9. Quantum meruit is a specific equitable theory that falls within the broader category of "unjust enrichment."  *Young v. Young*, 164 Wash.2d 477, 486 (2008).  As an initial matter, the Court must determine whether, under Washington law,[7] Aegean's claim for quantum meruit is really a claim for unjust enrichment.

Washington law distinguishes between quantum meruit claims and unjust enrichment claims.  *Young*, 164 Wash.2d at 484–85.  Unjust enrichment refers to a method of recovery when, without any direct contractual relationship between parties, one party retains a benefit it has not paid for.  *Id.* at 484.  Quantum meruit is a more specific subcategory of unjust enrichment that requires a "contract implied in fact" between parties: The parties must show through their actions a "mutual intention . . . to contract with each other."  *Id.* at 485.  Though the two concepts have slightly different labels, both refer to the same general type of relief.

---

[6] The Court notes that while both parties nominally discuss Canadian case law, the Court remains uncertain about how Canadian law applies to Aegean's claim.

[7] Neither party addresses whether Washington law provides the proper source of law for this claim.  The Court presumes that Washington law applies.  *See NextWave Marine Sys., Inc. v. M/V Nelida*, 488 F. Supp. 3d 1004, 1010 (D. Or. 2020) (applying Oregon unjust enrichment law in a maritime action, and noting that the parties "advance general maritime law and Oregon law in support of their arguments").  But in connection with any future pleadings or motions (if any are filed), the parties are welcome to brief this issue.

ORDER GRANTING MOTION TO
DISMISS WITHOUT PREJUDICE - 15

1    Aegean's quantum meruit claim is more accurately understood as an unjust enrichment

2  claim for two reasons: (1) Aegean alleges facts in the complaint that more clearly map the

3  elements of unjust enrichment, *see* Dkt. # 79 at 9, and (2) Canpotex uses the terms quantum

4  meruit and unjust enrichment interchangeably in its briefing. *See* Dkt. # 82 at 17.  It would

5  waste judicial resources to require Aegean to file an amended complaint that uses the proper

6  unjust enrichment terminology when it is otherwise clear from the complaint the form of relief

7  that Aegean is seeking (and indeed, Canpotex's briefing makes clear that it interpreted the claim

8  to refer to unjust enrichment, too).  Accordingly, the Court construes Aegean's claim as an unjust

9  enrichment claim.

10    The Court next addresses Canpotex's jurisdictional argument.  Canpotex argues that

11  Aegean cannot bring this equitable claim because this Court does not have personal jurisdiction

12  over Canpotex, and equitable claims cannot be brought *in rem*.  Dkt. # 82 at 17.  Aegean

13  counters that its equitable claim is not brought *in rem*, and Supplemental Maritime Rule B

14  provides the Court with appropriate jurisdiction over Canpotex's equitable claim through the

15  attachment of the Vessel and bunkers.  Dkt. # 84 at 9.  But even if there is jurisdiction, Canpotex

16  says, the Court should still dismiss the claim for failing to state a legally cognizable claim.  Dkt.

17  # 85 at 8.

18    The Court concludes that under Rule B, Aegean can bring an *in personam* unjust

19  enrichment claim against Canpotex.[8]  It is true that "*in rem* maritime liens cannot be conferred

20

21    [8] Aegean asserts that its quantum meruit claim is a *quasi in rem,* rather than *in personam*, cause of
action.  This distinction appears not to matter, as the line between an *in personam claim* and a *quasi in
22  rem* claim under Rule B is murky.  The Ninth Circuit recognized this murkiness in *Teyseer Cement Co. v.
Halla Mar. Corp.*, 794 F.2d 472 (9th Cir. 1986).  The court observed that "the nature of the jurisdiction
23  the court acquires by a Rule B attachment is properly denominated 'quasi in rem' because any judgment
rendered is limited to the value of the attached property."  But the court noted that "[a]ttachment provides
24  a limited substitute for the [*in personam* jurisdiction over a party]."  *Id.* at 476.  Therefore, Rule B
attachment provides *in personam* jurisdiction over Canpotex.

ORDER GRANTING MOTION TO
DISMISS WITHOUT PREJUDICE - 16

on the theory of unjust enrichment." *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 522 (2d Cir. 2018) (internal quotation marks omitted).  But parties can bring *in personam* unjust enrichment claims under maritime law.  *Id.*  ("[U]njust enrichment claims are available under maritime law as in personam claims").  When Aegean began this action in 2015, the Court ordered attachment and garnishment of the Vessel under Rule B.  Dkt. # 9; Dkt. # 12. Based on the attachment and garnishment ordered under Rule B, the Court has valid personal jurisdiction over Canpotex for its *in personam* unjust enrichment claim up to the value of the unpaid bunker fuel.[9]

With that jurisdictional issue aside, the Court now considers the merits of Aegean's unjust enrichment claim.  Under Washington law, the three elements of an unjust enrichment claim are: (1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment."  *Young*, 164 Wash.2d at 484–85.

Washington courts have rejected unjust enrichment claims in similar circumstances to those present here.  In *Farwest Steel Corp. v. Mainline Metal Works, Inc.*, the court considered a case in which an initial party employed a contractor, who in turn employed a subcontractor.  48 Wash. App. 719, 741 P.2d 58 (1987).  The contractor went bankrupt before it paid the subcontractor, and the subcontractor brought an unjust enrichment claim against the initial party. *Id.* at 732.  The court held that the subcontractor could not claim unjust enrichment against the initial party, even though the initial party was enriched by the subcontractor (because the initial party received the subcontractor's services without paying for them).  *Id.*  The *Farwest* court stated that "[e]nrichment alone will not suffice to invoke the remedial powers of a court of

---

[9] In its reply brief, Canpotex does not reassert its jurisdictional argument.

ORDER GRANTING MOTION TO
DISMISS WITHOUT PREJUDICE - 17

equity.  It is critical that the enrichment be unjust both under the circumstances and as between two parties to the interaction." *Id.*; *see also Bort v. Parker*, 110 Wash. App. 561, 580, 42 P.3d 980 (2002); *W.H. Hughes, Jr., Co., Inc. v. Day*, 162 Wash. App. 1069, 2011 WL 3278659, at *2 (2011).  And "where a third person benefits from a contract entered into between two other persons, in the absence of some misleading act by the third person, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third person." *Farwest*, 48 Wash. App. at 732 (quoting 66 Am. Jur. 2d Restitution and Implied Contracts, §16 at 960).  The court concluded that the initial party was a "mere incidental beneficiary" of the contract between the contractor and subcontractor because it did not mislead the subcontractor, cause the subcontractor's loss, or "acquiesce in or encourage the contract." *Id.* at 732–33; *see also W.H. Hughes, Jr. Co., Inc.*, 2011 WL 3278659, at *2.  Like the initial party in *Farwest*, Canpotex is an incidental beneficiary of the contract between OW and Aegean.  The mere fact that OW went bankrupt—preventing it from paying Aegean—does not automatically create an unjust enrichment cause of action against Canpotex, which was not a party to the contract between OW and Aegean.[10]  Aegean has not alleged that Canpotex acted with bad faith, misled Aegean, or encouraged the contract.  While Aegean asserts that Canpotex may have known that Aegean would serve as the physical supplier, it has not provided enough facts to plausibly suggest that Canpotex went so far as to "acquiesce in or encourage" the contract between OW and Aegean.  *See Farwest*, 48 Wash. App. at 732–33.  And Aegean has cited no case law for its assertion that parties in its position can pursue an unjust enrichment claim against parties like Canpotex.

---

[10] Canpotex alleges that it was not unjustly enriched because it "has, in fact, paid OW for the bunkers.  ING [OW's successor] was dismissed from this action after reporting that it settled with [Canpotex] and no longer had interest in the surety." Dkt. # 85 at 8.  However, there is no evidence of this payment in the record.

F.     Arrest of Bunker Fuel

This Court authorized the arrest of bunkers on the Vessel under Supplemental Maritime Rule D "for reasons set forth in the verified complaint." Dkt. # 11.  In its amended complaint, Aegean asserts that it still retains title to the bunkers through its terms and conditions, which apply to Canpotex through OW's L.4 clause.  Aegean's terms state:

> 11.1 Title in and to the Products delivered and/or property rights in and to such Products shall remain vested in the Seller until payment has been received by the Seller of all amounts due in connection with the respective delivery.
>
> 11.2 Until full payment of any amounts due to the Seller for whatever nature, has been made, the Buyer shall not be entitled to use the Products other than for the propulsing of the vessel, nor mix, blend, sell, encumber, pledge, alienate, or surrender the Products to any third party.

Dkt. # 79 at 5–6.

Rule D allows "a party to adjudicate the right to possession of property that has wrongfully been taken." *Cary Marine, Inc. v. Motorvessel Papillon*, 872 F.2d 751, 756 (6th Cir. 1989).  Thus, in disputes over title under maritime law, Rule D authorizes the arrest of a vessel and its cargo by the courts.  But "[a] 'petitory' action in admiralty must be predicated on the existence of legal, not merely equitable, title." *Percy v. Suchar*, 2001 WL 228434, at *3 (D. Me. Mar. 8, 2001) (citing *Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht*, 625 F.2d 44, 47 (5th Cir. 1980) ("[U]nlike a typical case of replevin, [the plaintiffs'] success in an admiralty petitory action would require proof of *legal title* and not merely a superior *equitable* title or interest." (emphasis in original)).

This cause of action appears to turn on whether Aegean's terms apply to Canpotex through Clause L.4.  If they do, then Aegean's terms provide that Aegean retains title to the bunkers until payment.  But as noted above, the Court concludes—based on the briefing provided thus far—that Aegean's terms do not apply to Canpotex.  There are insufficient

allegations that Aegean "insisted" that its terms apply, nor is it clear that insistence would create a direct contractual relationship between Aegean and Canpotex.  Because this claim rises and falls with the contract and "insistence" questions, the Court dismisses this claim.

G.      Maritime Arrestment and Garnishment

Aegean pleads a "cause of action" for "maritime attachment and garnishment."  Dkt. # 79 at 10.  The Court already issued an order for attachment and garnishment at the outset of this case.  The Court therefore interprets this cause of action to be a request that Aegean be paid from the substitute security posted with the Court.  *See* Dkt. # 79 at 10 ("Pursuant to Supplemental Rule B, this Court should order the judgment entered against CSSL, Indy Maritime SA and/or Gourmichalis Maritime SA paid from the Substitute Security").  Accordingly, this claim appears to rise and fall with Aegean's other claims, and is therefore dismissed without prejudice.

H.      Leave to Amend

Under Federal Rule of Civil Procedure 15(a)(2), a party may only amend its pleading more than once if the other party consents or with the leave of the court.  Fed. R. Civ. P. 15(a)(2).  The court should freely give leave for a party to amend its complaint "when justice so requires."  *Id.*  This principle should be applied with "extreme liberality," and courts should only dismiss without leave to amend when amendment would be futile.  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051–52 ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment.").  Because the Court finds that additional factual material and clarification of legal theories may cure the deficiencies identified in this order, the Court dismisses the amended complaint without prejudice and with leave to amend.

## IV

### CONCLUSION

For these reasons, the Court GRANTS the motion to dismiss without prejudice and grants Aegean leave to file a second amended complaint.  The Court grants Aegean twenty-one (21) days to file this amended complaint.

Dated this 16th day of December, 2022.

John H. Chun
United States District Judge