UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AEGEAN MARITIME PETROLEUM S.A., | CASE NO. 2:15-cv-00172-JHC |
| Plaintiff, | ORDER |
| v. | |
| KAVO PLATANOS M/V, ET AL., | |
| Defendants. | |

# I

## INTRODUCTION

Before the Court is Defendants' Canpotex Shipping Services, Ltd., Indy Maritime SA, and Gourdomichalis Maritime SA (collectively, "Canpotex") motion to dismiss the Second Amended Complaint.[1]  Dkt. # 100; *see also* Dkt. # 103 (reply brief).  Plaintiff Aegean Maritime Petroleum, S.A. opposes the motion.  Dkt. # 102.

The Court GRANTS the motion in part and DENIES it in part.

---

[1] There is some dispute about whether this motion was brought on behalf of all Defendants or just one Defendant.  As discussed below, the Court construes this as a motion to dismiss on behalf of all Defendants.

ORDER - 1

## II

### BACKGROUND

Canpotex Shipping Services, Ltd. chartered the M/V KAVO PLATANOS from Indy Maritime SA, the Vessel's owner.  Dkt. # 82 at 3.  In October 2014, Canpotex contracted with O.W. Bunkers (U.K.), Ltd. ("OW") to arrange for the delivery of bunker fuel to the Vessel in Vancouver, Canada.  Dkt. # 79–1.  At the time, OW was one of the largest providers of bunker fuel in the world.  OW then contracted with a physical supplier, Aegean Maritime Petroleum S.A., to deliver the bunker fuel.  Dkt. # 79-3.  Aegean delivered about 900 metric tons of bunker fuel to the Vessel, and the Vessel's Chief Engineer accepted the delivery.  Dkt. # 79-4.

The transaction as intended was not particularly complex.  Aegean was to deliver the fuel to the Vessel.  Canpotex would pay OW.  OW would pay Aegean.  But before anybody made payments on the bunker fuel, in November 2014, OW declared bankruptcy.  Dkt. # 82 at 3.  The OW bankruptcy threw the global bunker fuel industry into turmoil, leading to a frenzy of litigation across the country.

Aegean tried to recoup payment for the fuel it provided to the Vessel without success.  Aegean sent an invoice to OW for $463,050 (the cost of the fuel plus a delivery charge).  Dkt. ## 79-5 at 1, 82 at 3; 99 at 8.  Aegean also sent "the owners and operators of the M/V/ KAVO PLATANOS"—including Canpotex, the Vessel's charter—a Notice to Pay, requesting $454,050.  Dkt. # 35-3 at 2. But according to the complaint, no party paid Aegean for the fuel.  Dkt. # 99 at 9.

In February 2015, Aegean filed this action.  Dkt. # 1.  The complaint asserted causes of action against the Vessel *in rem* and against Defendants Canpotex (the Vessel's charterer), Indy Maritime SA (the Vessel's owner), and Gourdomichalis Maritime SA (the Vessel's manager) to recover for the fuel delivery.  *Id*.  The complaint sought recovery under United States law; it

primarily asserted that Aegean was entitled to a maritime lien under the Commercial Instruments and Maritime Lien Act (CIMLA).  *Id.*  Shortly after Aegean filed the action, this Court authorized the arrest and seizure of the Vessel (including all bunkers aboard) and issued a writ of maritime attachment and garnishment.  Dkt. ## 9, 12.  Canpotex posted $494,013 with this Court as substitute security for the Vessel, thereby securing the Vessel's release.[2]  Dkt. # 21.

In May 2015, Canpotex moved to dismiss, transfer, or stay the action.  Dkt. # 34.  The Court declined to dismiss or transfer the action.  Dkt. # 54.  But the Court granted a stay pending resolution of a series of cases in the Southern District of New York where several similar cases arising out of OW's bankruptcy were being litigated.  *Id.*  The Court stayed the case for six years while the Southern District of New York cases resolved.  During that time, the parties submitted regular status updates.  Dkt. ## 55–69.  Once the "test cases" in the Southern District of New York resolved, the Court lifted the stay.  Dkt. # 70.

In the Southern District of New York cases, courts generally held that under United States law, a subcontracting supplier of bunker fuel (like Aegean) generally does not hold a valid maritime lien unless it can show that the general contractor serving as the middleman (like OW) was acting as an "agent" of the vessel.  *See U.S. Oil Trading LLC v. M/V VIENNA EXPRESS*, 911 F.3d 652, 662–63 (2d Cir. 2018); *ING Bank N.V. v. M/V TEMARA*, IMO No. 9333929, 892 F.3d 511, 521–22 (2d Cir. 2018).  On facts like those here, courts generally held that OW did not act as the vessel's "agent," so the subcontracting physical supplier did not have a maritime lien against the vessel.  *Clearlake Shipping Pte Ltd. v. NuStar Energy Servs., Inc.*, 911 F.3d 646, 651–52 (2d Cir. 2018); *see also Aegean Bunkering (USA) LLC v. M/T AMAZON*, 730 F. App'x 87, 89 (2d Cir. 2018); *O'Rourke Marine Servs. L.P., L.L.P. v. M/V COSCO HAIFA*, 730 F.

---

[2] This amount represented the price of the bunker fuel plus interest.  Dkt. # 21.

App'x 89, 91 (2d Cir. 2018); *Chemoil Adani Pvt. Ltd. v. M/V MARITIME KING*, 742 F. App'x 529, 531 (2d Cir. 2018).  *But see Martin Energy Servs., LLC v. M/V Bravante IX*, 233 F. Supp. 3d 1269, 1275–79 (N.D. Fla. 2017) (holding that a subcontracting physical supplier held a valid maritime lien under U.S. law), *aff'd*, 733 F. App'x 503 (11th Cir. 2018).

After the Court lifted the stay in December 2021, Canpotex moved to dismiss the case. Dkt. # 77.  Aegean then amended its complaint.  Dkt. # 79.  While the original complaint filed in 2015 asserted claims under U.S. law, the amended complaint asserted claims based on Canadian law, including its statute governing maritime liens.

Canpotex moved to dismiss Aegean's amended complaint.  Dkt. # 82.  The Court granted Canpotex's motion to dismiss but provided Aegean an opportunity to amend its complaint.  Dkt. # 98.  In its order, the Court expressed skepticism about some of Aegean's claims.  *See, e.g.*, *id.* at 8–12.  But the Court also indicated that its conclusions were somewhat tentative: The Court was uncertain which body of law to apply to each claim.  *See, e.g.*, *id.* at 14–15 (dismissing Aegean's maritime lien claim but stating that because Aegean's shift to a Canadian-law theory "is the crux of Aegean's amended complaint and [] is not sufficiently briefed, the Court finds that dismissal without prejudice is appropriate.  In any future pleadings or briefing, the parties should carefully consider both (1) whether Canadian law applies, and (2) if so, whether Aegean would be entitled to a maritime lien under Canadian law."); *id.* at 15 n.7 ("Neither party addresses whether Washington law provides the proper source of law for this claim.  The Court presumes that Washington law applies. . . .  But in connection with any future pleadings or motions (if any are filed), the parties are welcome to brief this issue.").

Aegean filed a second amended complaint ("Second Amended Complaint" or "SAC").  Dkt. # 99.  As with the first amended complaint, the SAC asserts five "causes of action," all of which are based on Canadian law:

(1) an *in rem* maritime lien claim based on Canadian law;

(2) a claim for breach of contract;

(3) a claim for unjust enrichment/quantum meruit;

(4) a claim for "maritime attachment and garnishment"; and

(5) a claim for "arrest of all bunkers on board."

*Id.* Canpotex now moves to dismiss the SAC. Dkt. # 100.

### III
### LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a claim if it "fails to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs must plead enough facts that the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* For Rule 12(b)(6) motions, the court does not accept all legal conclusions in the complaint to be true, so conclusory statements of law or "formulaic recitation of the elements of a cause of action" do not suffice. *Id.*

### IV
### DISCUSSION

A.      Standing and Initial Arguments

Before addressing the merits of the motion, Aegean contends that Canpotex does not have "standing" to seek the release of the *res.* Dkt. # 102 at 3–6. Aegean's reasoning goes something like this: (1) Canpotex's Rule 12(b)(6) motion is akin to a Supplemental Admiralty and Maritime Claims Rule E(4)(f) motion; (2) one must file a "Statement of Interest," *see*

Supplemental Rule C(6), in the Vessel to bring a Supplemental Rule E(4)(f) motion; (3) Canpotex did not file a Statement of Interest in the Vessel; so (4) Canpotex does not have "standing" to bring this Rule 12(b)(6) motion.

But this reasoning relies on a mistaken premise: Even if registering an interest in the Vessel is a prerequisite to filing a Rule E(4)(f) motion, it does not appear to be a prerequisite to filing a Rule 12(b)(6) motion to dismiss.  Aegean cites no law to the contrary.  The cases cited by Aegean discuss only a defendant's ability to secure release of the property through a Rule E(4)(f) motion to vacate arrest or attachment, not a Rule 12(b)(6) motion to dismiss.  *See Probulk Carriers, Ltd v. Daewoo Logistics Corp.*, No. CIV A 09-3027, 2009 WL 700687, at *1–2 (E.D. La. Mar. 13, 2009); *Agrocooperative Ltd. v. Sonangol Shipping Angola (Luanda) Limitada*, No. CIV.A. H-14-1707, 2015 WL 138114, at *7 (S.D. Tex. Jan. 8, 2015).  As one district court put it, while "[a] person claiming an interest in property arrested or attached typically challenges the validity of the arrest or attachment through a motion to vacate under Supplemental Rule E(4)(f)," a party may file "a 12(b)(6) motion to dismiss . . . instead."  *MARMAC, LLC v. InterMoor, Inc.*, 566 F. Supp. 3d 559, 570 (E.D. La. 2021); *see also id.* at 569–70 (describing differences between Rule 12 motions and Rule E(4)(f) motions.  When reviewing a Rule 12(b)(6) motion, courts apply traditional "Rule 12(b)(6) standards"—not Supplemental Rule E(4)(f) standards.  *Id.*  And while Aegean frames this as a "standing" problem, it is not.  Standing typically refers to whether a *plaintiff* can bring an action.  Regardless, Canpotex has a concrete interest in the matter; after all, it has deposited nearly half a million dollars with the Court's registry to secure release of the Vessel.  Canpotex properly brings this motion to recover that money.

Aegean also contends that Canpotex (not Indy Maritime SA or Gourdomichalis Maritime SA) is the only party moving for dismissal, so the Court should not dismiss any claims against the other Defendants.  Dkt. # 102 at 5–6.  But as Canpotex states in its reply brief, Canpotex "is

moving on behalf of all co-defendants." Dkt. # 103 at 2.  No codefendant objects to this; and all

are represented by the same counsel.  Still, Canpotex offers to "withdraw [the motion]" and "re-

file naming all-codefendants." *id.*  But the Court agrees with Canpotex that such an exercise

would be unnecessary and redundant.  The Court will construe Canpotex's Rule 12(b)(6) motion

as made on behalf of all Defendants.

B.     Choice of Law

       Much of this case hinges on which body of law applies to Aegean's claims.  While

Aegean's initial complaint was based on U.S. law, the SAC asserts claims based on Canadian

law.  The Court concludes that Canadian law applies as the background law of this case.

       1.     Determining the Proper Source of Background Law

       "[F]ederal courts sitting in admiralty apply federal maritime choice-of-law principles

derived from the Supreme Court's decision in *Lauritzen v. Larsen*, 345 U.S. 571, (1953), and its

progeny." *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1124 (9th Cir.

2008) (quoting *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir.1997)).  In

*Lauritzen*, the Supreme Court provided seven non-exclusive factors that courts use to determine

which country's law applies: (1) the place of the wrongful act; (2) the law of the flag; (3) the

allegiance or domicile of the injured party; (4) the allegiance of the defendant ship owner; (5) the

place of contract; (6) the inaccessibility of a foreign forum; and (7) the law of the forum.

*Lauritzen v. Larsen*, 345 U.S. 571, 583–91 (1953); *see also Trans-Tec*, 518 F.3d at 1124

(applying the *Lauritzen* factors in a maritime lien case); *Gulf Trading & Transp. Co. v. M/V

Tento*, 694 F.2d 1191, 1194–95 (9th Cir. 1982).  Generally, "courts should weigh and evaluate

all relevant points of contact between the transaction and the sovereign legal systems that are

affected by it, and not simply run through a mechanical analysis of the *Lauritzen* factors."

*Trans-Tec*, 518 F.3d at 1124.  This can include factors from the Restatement (Second) of

Conflict of Laws § 188 (1971), such as the place of negotiation of the contract, the place of performance, and the place of business of the parties.  *Id.*

Though Aegean once argued that U.S. law applies, it now argues that its entire case is governed by Canadian law.  In its previous order, the Court expressed uncertainty about what country's law applies to the case.  Dkt. # 98 at 14 ("Based on the facts alleged in the complaint and the briefing provided thus far, the Court is unsure whether Canadian law applies to Aegean's lien claim."); *id.* at 15 n.7 ("Neither party addresses whether Washington law provides the proper source of law for [the unjust enrichment claim].  The Court presumes that Washington law applies. . . . But in connection with any future pleadings or motions (if any are filed), the parties are welcome to brief this issue.").  The Court expressly requested that "[i]n any future pleadings or briefing," the parties should "carefully consider . . . whether Canadian law applies."  *Id.* at 15.

Despite this admonishment to conduct a careful choice-of-law analysis, Aegean provides only two sentences—one in the SAC and one in its response brief—explaining why Canadian law applies.  Dkt. ## 99 at 9, 102 at 8.  Those two sentences list several facts connecting this case to Canada, but do not otherwise provide any legal analysis.  Aegean also fails to grapple with facts that might dictate applicability of a different country's law (say, based on the "law of the flag" factor).

Canpotex's choice-of-law arguments are not wholly satisfying either.  For Aegean's maritime lien claim, Canpotex assumes for purposes of its motion that Canadian law governs the claim.  It then argues that under Canadian case law, the parties' respective terms and conditions form a hybrid contract between Aegean, OW, and Canpotex based on some combination of the parties' terms.  And that under this hybrid contract, Canpotex says, a choice-of-law provision points back to U.S. maritime lien law, which does not provide Aegean with a maritime lien.  As for Aegean's other causes of action, Canpotex appears to argue that Greek law controls the

breach of contract claim (based on a different choice-of-law provision in the hybrid contract) and that Washington law applies to the unjust-enrichment claims.

Canpotex's reasoning is insufficient for three reasons.

*First*, even when there is a choice-of-law provision in a contract, a court must still determine which country's law applies to contract *formation*.  This is because a choice-of-law provision within a contract is meaningless if, under applicable contract-formation law, the contract is not valid, enforceable, and binding on the parties.  As the Ninth Circuit put it, there is a "temptation [] to skip directly to" to the law chosen by the parties, this approach "put[s] the barge before the tug." *Trans-Tec*, 518 F.3d at 1124 (citation and quotation marks omitted) (second alteration in original).   A court "cannot rely on the choice of law provision until [it has] decided, as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract." *Id.*  So a court must "consider which country's law governs the incorporation [of a choice of law provision] as if there were no choice of law clause." *Id.*  The Ninth Circuit summed up the analytical inquiry as follows:

> (1) we determine the governing law with respect to contract formation; (2) applying the controlling law, we next determine whether the contract incorporates the choice of law provision; and (3) finally, if the choice of law provision is incorporated as a term of the contract, we evaluate whether [the plaintiff] acquired a maritime lien for supplying fuel bunkers to the [vessel].

*Id.* at 1123–24.

In this case, this contract-formation analysis is not a mere formality, as it appears that different countries have taken different approaches to whether there is a contractual relationship between a physical supplier of bunker fuel (like Aegean) and a charterer (like Canpotex) when an intermediary (like OW) sits between them.  While several U.S. courts applying U.S. law have suggested that there is likely no contractual privity between parties in Aegean and Canpotex's shoes (and thus, no contractual choice-of-law provision applies to the parties' dealings), as

explained below, the Canadian Federal Court of Appeal has held that such parties are, in fact, in contractual privity.  Whether the parties are in contractual privity determines whether a contractual choice-of-law provision applies, which in turn determines the applicable substantive law.  And whether the parties formed a contractual relationship determines which, if any, of Aegean's claims are viable.  For example, in most U.S. jurisdictions, if the parties formed a contract, there could be a breach of contract claim but not an unjust-enrichment claim; but if the parties did not form a contract, there could be an unjust enrichment claim but no breach of contract claim.  So whether the parties formed a valid contract is critically important.

*Second*, Canpotex's choice-of-law position shifts for different claims.  Canpotex assumes for purposes of the maritime lien claim that Canadian law applies.  Canadian law suggests that there is a contract between Aegean, OW, and Canpotex.  And that contract contains a choice-of-law provision pointing to U.S. maritime lien law.  But the conclusion that a contract (and its choice-of-law provision) governs the parties' dealings is at least in apparent tension with Canpotex's assertion that Aegean's breach of contract claim fails.  For the unjust enrichment claim, Canpotex appears content to apply Washington law.  But Canpotex cannot have it both ways, relying on Canadian law when helpful to its maritime lien argument but Washington law when helpful to its unjust enrichment argument.

*Third*, even if the choice-of-law provisions in the parties' contract govern many claims in this action, these provisions do not control for Aegean's unjust enrichment claim, which is presumably an alternative request for relief in the event that the Court finds that the parties did not enter an enforceable contract.  A *Lauritzen*-style choice-of-law analysis is necessary for any claim, if any, not based on the existence of a contract.

In sum, despite having had ample opportunity to do so, no party provides adequate choice-of-law analysis based on maritime choice-of-law principles.  Without sufficient guidance

from the parties, the Court tentatively assumes, based on its own evaluation of the *Lauritzen* factors, that Canada bears the greatest connection to this action, so Canadian law applies. Aegean provided the bunker fuel in Vancouver, Canada.  This is where Canpotex allegedly received and used the fuel without paying for it ("place of the wrongful act" factor).  The Vessel's charterer, Canpotex, is a Canadian company ("place of business of the parties" factor in § 188 of the Restatement and related to the "allegiance of the defendant shipowner" *Lauritzen* factor).  Aegean "provided the bunkers through its Vancouver office."  Dkt. # 99 at 9.  The only contact this interaction has with the United States is the fact that the Vessel was arrested here. And the parties provide no other facts that would support application of another country's laws, such as facts about the flag of the vessel or any other *Lauritzen* factors.

The Fourth Circuit's decision in *Ocean Ship Supply, Ltd. v. MV Leah*, 729 F.2d 971 (4th Cir. 1984), is instructive.  There, the court held that Canadian law applied to a maritime lien claim because it was "dealing with a Canadian corporation, a Canadian port, and a foreign ship." *Id.* at 974.  That the ship "put in at a United States' port is simply a fortuitous incident in the context of this litigation.  Without demonstration of more concrete ties to the United States, . . . the modern choice-of-law approach would dictate that Canadian law be used."  *Id.*  Similarly, Canpotex is a Canadian company, Aegean provided fuel from its Canadian office, and the Vessel was docked at a Canadian port when Aegean delivered the fuel.  Dkt. # 99 at 9.  The parties provide no other facts that would aid the Court in its choice-of-law analysis.

The Court therefore tentatively concludes that Canadian law governs the issue of contract formation and serves as the background law of this case.

2.      Applying Canadian Law to Contract Formation

The Court must next apply Canadian law to determine whether Aegean and Canpotex

formed a contract.  *See Trans-Tec*, 518 F.3d at 1124. This in turn controls whether a contractual

choice-of-law provision governs the parties' dealings.

Aegean does not contend that there is a traditional, direct two-party contract between

Aegean and Canpotex; none seems to exist.  Instead, the SAC states that either "[d]irectly

through the agency of OWB and/or through the operation of OW Terms Clause L.4," Aegean

and Canpotex entered a contractual relationship.  Dkt. # 99 at 10.

As an initial matter, the Court disregards Aegean's standalone reference to a contract

arising through the "agency" of OW.  Despite ample opportunities to expand upon this theory,

Aegean has not explained its theory that its contract with OW arises through agency.  *See*

*Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019) ("[Plaintiff]

has the burden of establishing that an agency relationship exists."); *Valero Mktg. & Supply Co. v.*

*M/V ALMI SUN, IMO No. 9579535*, No. 14-2712, 2015 WL 9459971, at *10 (E.D. La. Dec. 2,

2015) ("Agency is never to be presumed; it must be shown affirmatively, and the party who

asserts the existence of an agency relationship has the burden of proving it.").  Aegean has not

explained which party is the principal, which party is the agent, how the agency relationship was

formed, and the scope of that agency relationship.

This leaves the question whether Aegean and Canpotex entered a contract based on

"Clause L.4."  While Aegean's argument is far from clear, its reasoning goes something like this:

Canpotex signed a contract with OW for the provision of bunker fuel.  The Canpotex-OW

contract contains a provision, "Clause L.4."  Clause L.4 states that when "the physical supply of

the Bunkers is being undertaken by a third party" like Aegean, and Aegean "insists that the

Buyer [Canpotex] is also bound by [Aegean's] own terms and conditions," the OW-Canpotex

terms and conditions will be "varied" accordingly, such that "the Buyer [Canpotex] shall be

deemed to have read and accepted the terms and conditions imposed by the said third party."

Dkt. # 79 at 4.[3]  In other words, Aegean seems to argue that if it "insist[ed]" to Canpotex that its

terms and conditions apply, then the contract is "varied" to incorporate Aegean's terms and

Canpotex is deemed to have accepted those contract terms.  Aegean's terms purport to apply to

parties like Canpotex.  *See* Dkt. # 99-3 at 2–3 (defining "Buyer" as "the party/ies described in the

Nomination Telex" and including the "Charterer" of the M/V KAVO PLATANOS as a "Buyer"

in the Bunker Confirmation).  So Aegean concludes that Clause L.4 creates a direct contractual

relationship between Aegean and Canpotex.

 Drawing on U.S. contract law principles, this Court previously expressed skepticism that

Clause L.4 could create contractual privity between Canpotex and Aegean.  Dkt. # 98 at 8–12.

Other U.S. courts have come to similar conclusions.  *See, e.g.*, *Aegean Bunkering (USA) LLC v.

Amazon*, 2016 WL 4471895, at *12 (S.D.N.Y. Aug. 24, 2016) (rejecting Aegean's argument that

Clause L.4 "creates a direct contractual relationship between the vessel interests and Aegean,"

concluding that this interpretation was "fundamentally incorrect")*, aff'd sub nom. Aegean

Bunkering (USA) LLC v. M/T AMAZON*, 730 F. App'x 87 (2d Cir. 2018); *ING Bank N.V. v.

Temara*, 203 F. Supp. 3d 355, 370 (S.D.N.Y. 2016) ("CEPSA cannot assert that any entity other

---

[3] Clause L.4 states:
> (a) These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party [Aegean] which insists that the Buyer [Canpotex] is also bound by its own terms and conditions. In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.
> . . . .
> (iii) A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions.

Dkt. # 79 at 4.

than OW USA breached a contractual obligation it owed to CEPSA.  A breach of contract claim will not lie without an underlying contract, and as a result CEPSA's *in personam* claim against ING must be dismissed."), *aff'd sub nom. ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511 (2d Cir. 2018).  And even if Clause L.4 could create a contract between Aegean and Canpotex, the Court was doubtful that Aegean sufficiently "insisted" to Canpotex that its terms apply, a prerequisite for application of Clause L.4.  Dkt. # 98 at 8–12.

But Canadian courts have reached a different conclusion.  In *ING Bank N.V., et al. v. Canpotex Shipping Services Limited, et al.*, 2020 FCA 83 (Can.), the Canadian Federal Court of Appeal confronted a near-identical arrangement to the one presented here.  *See generally* Dkt. Dkt. # 84-1 (copy of decision).  As here, Canpotex was the vessel's charterer, OW was the charterer's immediate contractual partner, OW's terms contained Clause L.4, and a physical supplier sought payment from Canpotex when it delivered fuel but never received payment. After thoroughly analyzing the parties' various contracts, the court stated that "[a]lthough there is no doubt that subsection L.4 (a) will vary the terms and conditions of the contract between OW and Canpotex, in my view, it also confirms that when the third party 'insists that the Buyer is also bound by its own terms and conditions', Canpotex agrees and accepts that OW would bind it to the terms imposed by such a party, which in this case, clearly requires that it be bound as a Customer under Petrobulk's [the physical supplier] contract."  *Id.* at 29 (para. 84).  By agreeing to Clause L.4 in the OW contract, the court said, Canpotex effectively "grant[ed]" OW the authority "to bind it vis-à-vis the actual supplier of the bunker."  *Id.* at 30 (para. 86).  There was "no need for direct negotiation between Canpotex and Petrobulk for Canpotex to be bound to Petrobulk. . . . Canpotex agreed and accepted to be bound by the third party [terms].  It was at the very least implicit that OW had the authority to bind Canpotex to Petrobulk when this was required to give full effect to its [terms]."  *Id.* at 31 (para. 88).  Accordingly, "Canpotex was thus

contractually liable jointly and severally with OW to pay for the bunkers actually delivered by Petrobulk." *Id.* at 31 (para. 89).[4]

Applying the Canadian Court of Appeal's decision in *ING Bank*, there is a form of contractual privity between Aegean and Canpotex.  So long as Aegean "insist[ed]" that its terms apply (as it pleads in its complaint), there is a contractual relationship between Aegean and Canpotex.

What, then, is the nature of this contractual relationship?  As interpreted by the Canadian Court of Appeal in *ING Bank*, Clause L.4 creates a contractual relationship based on some combination of OW's terms and Aegean's terms.  As the court explained, the terms of this Aegean-Canpotex relationship "are to be found in the OW [terms] and [Aegean's terms], read and interpreted together."  Dkt. # 84-1 at 24 (para. 66).  The terms of the third party "will be incorporated" into the contract, and the third-party terms will "presumably supersede [the OW terms] if irreconcilable."  *Id.* at 22 (para. 60).  In other words, the Canadian Court of Appeal decision in *ING Bank* suggests that courts should attempt to read the two sets of terms—OW's terms and Aegean's terms—in harmony.  But when the terms are "irreconcilable" on a given point, the third-party's terms will control.

Here, the parties' terms provide two choice-of-law provisions.[5]  First, Clause P.5 of the OW terms state that "The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal

---

[4] Judge Pelletier dissented, reasoning that because "Canpotex is not a party to [the] contract . . . the doctrine of privity prevents contracting parties from imposing liability on a third party without its consent."  Dkt. # 84-1 at 38 (para. 113).

[5] While the Canadian *ING Bank* case is similar to this case in many respects, the Canadian Federal Court of Appeal did not discuss any choice-of-law provisions, presumably because the parties did not raise such issues.  *See* Dkt. # 84-1 at 15 (para. 37) ("[I]t was not argued that the Federal Court or this Court had to apply any principles of interpretation other than those set out in Sattva [a Canadian case] . . . . This is somewhat surprising because, if as argued by ING, L.4 did not apply here, the OW GTCs are subject to English Law.").

action." Dkt. # 83-1 at 12.  Second, Section 18 of the Aegean terms state that "the Agreement its

performance and enforcement is governed by the Greek Law."  Dkt. # 99-3 at 5.

Canpotex argues that under *ING Bank*—which calls for the parties' terms to be read

together unless irreconcilable—an integrated contract emerges containing both choice-of-law-

provisions because the terms are not irreconcilable.  Reading the two sets of terms together,

Canpotex says that the operative hybrid terms of the agreement provide that (1) "[t]he General

Maritime Law of the *United States* shall always apply with respect to the existence of a *maritime

lien*," (OW Clause P.5, Dkt. # 83-1 at 12 (emphasis added)), but (2) otherwise, Greek law

governs "the Agreement, the contract performance and enforcement" (Aegean Term 18, Dkt.

# 99-3 at 5).  Canpotex says these two terms are not "irreconcilable"—and thus should be read

together if possible—because it can both be true that United States law "always appl[ies]" to the

discrete issue of the existence of a maritime lien, while Greek law otherwise controls how the

agreement is interpreted and enforced.  Aegean provides no response to Canpotex's argument in

its response brief or in the opinion of its Canadian law expert.  Aside from cursory citations to

the *ING Bank* decision, Aegean does not discuss the *ING Bank* decision or the parties' choice-of-

law provisions at all.  Presented with no contrary argument, the Court concludes that Canpotex's

interpretation of the *ING Bank* decision and the parties' choice-of-law provisions is sensible and

adopts Canpotex's position.

As in other contexts, courts sitting in admiralty will generally enforce contractual choice-

of-law provisions.  "Absent a strong showing that it should be set aside, the parties' choice of

law provision, as part of a 'freely negotiated private international agreement, unaffected by

fraud, undue influence, or overweening bargaining power . . . should be given full effect.'"

*Trans-Tec*, 518 F.3d at 1126 (quoting *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 12–13

(1972)).  No party has suggested that the contractual choice-of-law provisions should not be

honored.  So the Court will apply these choice-of-law provisions to claims that hinge on a contract.

C.      Maritime Lien Claim

"A maritime lien 'is a right in the vessel' that entitles a vessel's creditor to have the vessel sold in order to satisfy an outstanding debt."  *Addax Energy SA v. M/V Yasa H. Mulla*, 987 F.3d 80, 86 (4th Cir. 2021) (quoting  *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 982 F.2d 765, 768 (2d Cir. 1992)); *Trans-Tec*, 518 F.3d at 1128.  "It has been defined as: '(1) a privileged claim, (2) upon maritime property, (3) for service done to it or injury caused by it, (4) accruing from the moment when the claim attaches, (5) traveling with the property unconditionally, (6) enforced by means of an action in rem.'"  *Trans-Tec*, 518 F.3d at 1128 (quoting *Black's Law Dictionary* 943 (8th ed. 2004)).  A maritime lien serves the "dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away."  *Id.* (quoting *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986)).  Maritime liens are *stricti juris* and can be created only through operation of law—like a statute—and not by a contract.  *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 519 (2d Cir. 2018).  A Plaintiff may bring an *in rem* action in a United States court "[t]o enforce any maritime lien."  Supplemental Rule C(1)(a).

In Aegean's initial complaint and motions for arrest of the Vessel, Aegean asserted a maritime lien based on United States law.  But Aegean has since reversed course and now claims a maritime lien based on Canadian law.  The Canadian Marine Liability Act § 139 (S.C. 2001, c. 6)—which governs maritime liens under Canadian law—states that "[a] person, carrying on business in Canada, has a maritime lien against a foreign vessel for claims that arise . . . in respect of goods, materials or services wherever supplied to the foreign vessel for its operation or maintenance."

But as described above, under the Canadian Federal Court of Appeal's reasoning in *ING Bank*, the parties have agreed to a choice-of-law provision that "always" calls for application of U.S. law "with respect to the existence of a maritime lien." Dkt. # 83-1 at 12. Aegean presents no argument about why the Court should disregard this U.S. choice-of-law provision. *Trans-Tec*, 518 F.3d at 1126 (contractual choice-of-law provisions are generally enforceable, including for the existence of maritime liens). Aegean does not discuss the parties' choice-of-law provisions or grapple with the implications of the *ING Bank* decision for its maritime lien claim. So the Court concludes that the U.S. choice-of-law provision for maritime liens applies.

If U.S. law governs the existence of a maritime lien, Aegean's lien claim fails. Aegean has unequivocally abandoned any claim for a maritime lien under U.S. law. *See* Dkt. # 80 at 2 (conceding that under U.S. law, "only the direct counterparty of the entity ordering the bunkers (here, [Canpotex])" can obtain a maritime lien, and a "'downsteam' entity (like Aegean) hold no maritime lien *in rem*"). *Compare* Dkt. # 1 (original complaint, asserting causes of action under U.S. maritime lien law), *with* Dkt. ## 79, 99 (amended complaints, omitting all claims under U.S. maritime lien law and adding claims under Canadian maritime lien law). Because the parties' hybrid terms call for application of U.S. law for all maritime lien claims, and because Aegean has abandoned any claim for a maritime lien based on U.S. law, its maritime lien claim fails.

The Court notes that even if it were to apply the choice-of-law provision in *Aegean*'s own terms, it appears that Aegean's lien claim would still fail. Aegean's own terms call for application of Greek law. Dkt. # 99-3 at 5. And while the parties have not briefed the issue, it appears "Greek law does not recognize maritime liens for the provision of necessaries" like bunker fuel. *See Lion de Mer, S.A. v. M/V Loretta D*, No. CIV. L-98-921, 1998 WL 307077, at *2–3 (D. Md. Apr. 3, 1998); *see also Vestoil, Ltd. v. M/V M Pioneer*, 148 F. App'x 898, 900

(11th Cir. 2005) ("Vestoil concedes that Greek law does not recognize a maritime lien for the provision of necessaries such as fuel oil and bunkers.").  Aegean does not address the effect of the Greek choice-of-law provision on its maritime lien claim.  But Aegean's Greek law expert seems to argue Greek law for follows "*lex fori*," or "the law of the country in the territory of which the court having *in rem* jurisdiction is located," for *in rem* actions.  Dkt. # 102-1 at 5.  But this does not help Aegean.  If the Greek choice-of-law provision points to Greek law, and Greek law calls for application of the law of the forum, then this Court would apply U.S. substantive law.  And as noted above, Aegean has abandoned any claim under U.S. maritime lien law.  *See* Dkt. # 80 at 2.

Aegean's Greek law expert seems to suggest that Greek law's "*lex fori*" approach requires a U.S. court to apply U.S. choice-of-law rules (and apparently not U.S. substantive law), which he says points to application of Canadian law.  Dkt. # 102 at 5.  Such a rule may produce an endless choice-of-law loop: Applying Greek law, the Court would apply U.S. choice-of-law rules (the law of the forum); based on U.S. choice-of-law rules, the Court would find that Canadian law applies; based on Canadian law, a contractual choice-of-law provision applies; based on the contractual choice-of-law provision, Greek law applies; and Greek law points back to U.S. law, at which point the Court would have to begin the analysis once more.  This is not persuasive.

In sum, Aegean presents no argument that one or both of the choice-of-law provisions in the OW terms and Aegean terms should not apply to its maritime lien claim.  And if either choice-of-law provision applies, Aegean's maritime lien claim fails.  The Court dismisses Aegean's maritime lien claim with prejudice.

1

2

D.      Breach of Contract Claim

        Aegean asserts a breach of contract claim.  Dkt. # 99 at 10.  The complaint states that

3

either "[d]irectly through the agency of OWB and/or through the operation of OW Terms Clause

4

L.4," Aegean has a direct cause of action against Defendants "for their failure to pay for the

5

bunkers which Aegean provided to the Vessel."  *Id*.

6

        As described above, U.S. courts have expressed skepticism that Clause L.4 creates a

7

contractual relationship between the two parties.  *See e.g.*, *Aegean Bunkering*, 2016 WL

8

4471895, at *12; *ING Bank*, 203 F. Supp. 3d at 370; Dkt. # 98 at 8–12.  But applying Canadian

9

law, the Canadian Federal Court of Appeal held in *ING Bank* that "Canpotex [is] thus

10

contractually liable jointly and severally with OW to pay for the bunkers actually delivered by

11

Petrobulk [the physical supplier]."  Dkt. # 84-1 at 31 (para. 89).  So if this contract and the

12

remedies for a breach are governed by Canadian law, there would be a viable breach of contract

13

claim, at least as to Canpotex.[6]

14

        But Canpotex argues that the Court should not apply Canadian law.  Dkt. # 100 at 11–13.

15

This is because the contract that emerges from the combined OW and Aegean terms contains a

16

general choice-of-law provision—drawn from Aegean's own terms—which states that "the

17

Agreement its performance and enforcement is governed by the Greek Law."  Dkt. # 99-3 at 5.

18

So Canpotex argues that the contract and its remedies should be interpreted under Greek law.

19

Dkt. # 100 at 11–13.  Canpotex says that Aegean filed suit in Greece on the same facts as this

20

action and lost that case.  *Id.* at 12.  So Canpotex says that the breach of contract claim should

21

suffer the same fate and fail too.

22

23

24

        [6] The Canadian Federal Court of Appeal declined to address whether Clause L.4 could bind an entity other than the charterer (for example, a vessel's owner).  Dkt. # 84-1 at 30 (para. 86).  So it is less clear whether the *ING Bank* decision compels the conclusion that the defendants *other* than Canpotex could be contractually liable.

The Court is inclined to agree with Canpotex that Greek law should control the interpretation of the contract. If Canadian law governs contract formation, and under Canadian law, the parties' contract contains a valid choice-of-law provision, it seems likely that the Court should apply Greek law to contract interpretation and enforcement.

Aegean does not address Canpotex's breach of contract arguments at all. Aegean might have responded (but did not) that this is not what the Canadian Federal Court of Appeal did in the *ING Bank* case, so this approach conflicts with Canadian case law. But the *ING Bank* decision did not mention whether the physical supplier's terms contained a similar choice-of-law provision. Nor does the *ING Bank* decision suggest that the parties presented a contractual choice-of-law argument to the court; the decision mentions a choice-of-law provision only in passing. *See* Dkt. # 84-1 at 15 (para. 37) ("[I]t was not argued that the Federal Court or this Court had to apply any principles of interpretation other than those set out in *Sattva* [a Canadian case]. . . . This is somewhat surprising because, if as argued by ING, L.4 did not apply here, the OW GTCs are subject to English Law."). Finally, while the complaint lists a breach of contract claim, Aegean's brief presents no argument in support of that claim.

But the Court cannot dismiss Aegean's breach of contract claim. No party has provided information about Greek contract law. Nor has either party provided the Court with the judicial opinions of Aegean's (supposedly unsuccessful) suit in Greece. So the Court lacks sufficient information to determine whether Aegean's breach of contract claim is viable under Greek law.

The Court notes, however, some uneasiness with its conclusion. Canpotex argues that the parties entered a contract that contains multiple choice-of-law provisions. Based on those contractual provisions, the Court has dismissed Aegean's maritime lien claim, and Canpotex requests that the Court dismiss Aegean's other claims too. But Canpotex seems to argue that while there is a sufficient contract to bind the parties to their chosen law—resulting in dismissal

of at least one of Aegean's claims—the contract is not sufficient to give any contractual remedies to Aegean for breach of that contract.  Under such an interpretation, Aegean gets the worst of both worlds: a contract that precludes certain claims, but not a contract that can be enforced directly.  While the Court hesitates to adopt such an approach, it does not reach any conclusion on this issue because regardless, the Court lacks sufficient information about Greek law to dismiss Aegean's contract claim.

E.      Unjust Enrichment

         Aegean asserts a cause of action for unjust enrichment.  Dkt. # 99 at 10–11.

         In its prior order, the Court "presume[d]" that Aegean's unjust-enrichment claim should be analyzed under Washington state law.  Dkt. # 98 at 15 n.7; *see also Coastal Iron Works, Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.*, 783 F.2d 577, 582 (5th Cir. 1986) ("[S]tate law may supplement maritime law where maritime law is silent.").  Based on a Washington Court of Appeals decision, *Farwest Steel Corp. v. Mainline Metal Works, Inc.*, 48 Wash. App. 719, 741 P.2d 58 (1987), the Court concluded that a subcontractor like Aegean could not assert an unjust enrichment claim against a primary party like Canpotex unless the primary party "acquiesce[d] in or encourage[d] the contract" between the subcontractor and general contractor. *Id.* at 732–33.  So the Court dismissed this claim with leave to amend.  Dkt. # 98 at 15–18.  But the Court was not sure that Washington law provides the proper governing law.  *Id.* at 15 n.7.  "Neither party addresse[d] whether Washington law provides the proper source of law for this claim," so the Court invited the parties to "brief this issue" in any future pleadings or motions. *Id.*

         Canpotex says that it is proper to apply Washington state law to this claim.  Dkt. # 100 at 13–14.  It is true that a court applying U.S. maritime law may sometimes borrow from state law to inform its analysis.  *See Coastal Iron Works*, 783 F.2d at 582 ("[S]tate law may supplement

maritime law where maritime law is silent."); *NextWave Marine Sys., Inc. v. M/V Nelida*, 488 F. Supp. 3d 1004, 1010 (D. Or. 2020) ("[S]tate law may supplement federal maritime law when maritime law is silent or where a local matter is at issue, but state law may not be applied where it would conflict with maritime law." (quoting *Floyd v. Lykes Bros. S.S. Co.*, 844 F.2d 1044, 1047 (3d Cir. 1988))). But as discussed above, the Court tentatively assumes that Canadian law applies to this action because it has a stronger connection to the dispute than the United States. And Canpotex cannot have it both ways: It cannot benefit from application of background Canadian law and the *ING Bank* decision for the maritime lien claim while arguing that Washington state law applies to other claims. Washington law is not the proper source of law for this claim, and the Court will apply Canadian unjust enrichment law.

Under Canadian law, a cause of action for unjust enrichment lies if "something . . . [has] been given by the plaintiff and received and retained by the defendant without juristic reason." *Kerr v. Baranow*, [2011] 1 S.C.R. 269, para. 31. Canadian law "permits recovery whenever the plaintiff can establish three elements: an enrichment of or benefit to the defendant, a corresponding deprivation of the plaintiff, and the absence of a juristic reason for the enrichment." *Id.* at para. 32. The third element—absence of a juristic reason—is met when "there is no reason in law or justice for the defendant's retention of the benefit conferred by the plaintiff, making its retention 'unjust' in the circumstances of the case." *Id.* at para. 40.

Based on the briefing before the Court, Aegean has stated a plausible claim for unjust enrichment under Canadian law.

First, Canpotex received a windfall when it received and used 900 tons of bunker fuel but, according to the complaint, did not pay for the fuel. Indeed, Canpotex even said in an earlier filing at the outset of this case that it "wants to pay for the fuel it purchased," but merely sought

to avoid having to pay twice: once to OW's successor-in interest, ING, and once to Aegean. Dkt. # 34 at 9.  Canpotex recognized that its failure to pay someone might result in a windfall.

Canpotex argued in an earlier filing that it "has, in fact, paid OW for the bunkers.  ING [OW's successor-in-interest] was dismissed from this action after reporting that it settled with [Canpotex]."  Dkt. # 85 at 8.  If it turns out that Canpotex has paid OW's successor-in-interest in full for the bunker fuel, then this claim would fail, as Canpotex would not be unjustly enriched. Similarly, if Canpotex made partial payments to OW's successor-in-interest to satisfy its debt, that amount would be deducted from the amount potentially owed to Aegean.  And if Canpotex contributed to OW's bankruptcy estate in some way, this too would affect the calculation of how much Canpotex was unjustly enriched.  But at the motion to dismiss phase, and based on the record, the Court must assume that Canpotex was unjustly enriched by its retention of 900 tons of bunker fuel.  Canpotex should elaborate on this to the Court in the future.

Second, Canpotex's alleged failure to pay led to a corresponding detriment to Aegean, as Aegean did not receive compensation for the bunker fuel it delivered.

Third, while the Court is uncertain whether this situation satisfies the "absence of juristic reason" element under Canadian law, this situation may fit the mold.  There is no particularly good reason why Canpotex should receive a windfall because an intermediary happened to go bankrupt before the parties had time to process their payments.  Canpotex even said in an earlier filing that it "wants to pay for the fuel it purchased," but merely sought to avoid having to pay twice.  Dkt. # 34 at 9.  Recovery under unjust enrichment principles may provide for such a solution.  But the Court's conclusion could *easily* be altered by more information about Canpotex's settlement with ING, information about the OW bankruptcy proceedings (and the parties' role in such proceedings), or further explanation of Canadian case law on unjust enrichment.  It may turn out that Canpotex was not enriched, or if it was, such enrichment was

not unjust. But without additional facts, the Court cannot dismiss this claim at this stage in proceedings.

In its reply brief, Canpotex argues that unjust enrichment is unavailable if the rights and obligations of the parties are governed by a valid and enforceable contract, and so "Aegean's contract arguments preclude its potential recovery for unjust enrichment." Dkt. # 103 at 7. But this ignores the fact that a complaint can state inconsistent theories of recovery. *See* Fed. R. Civ. P. 8(a)(3) ("[P]leading that states a claim for relief . . . may include relief in the alternative or different types of relief); Fed. R. Civ. P. 8(d) ("A party may set out 2 or more statements of a claim or defense alternative or hypothetically, either in a single count or defense or in separate ones . . . A party may state as many separate claims or defenses as it has, regardless of consistency."); *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 858–59 (9th Cir. 2007) ("[W]e allow pleadings in the alternative—even if the alternatives are mutually exclusive."). While Aegean may not recover on both its contract theory and unjust enrichment theory, Aegean may argue that if its contract claim fails, it is entitled to compensation based on principles of unjust enrichment.

More importantly, as Canpotex correctly observes, no party explains "whether a claim for unjust enrichment may be maintained in Canada when the plaintiff simultaneously asserts a breach of contract claim governing the same subject matter." Dkt. # 103 at 7 n.1. The Court cannot dismiss this claim—based on an argument first presented in a reply brief—without more information about Canadian law.

And the Court is uncertain about the consistency of Canpotex's position. As with Canpotex's breach of contract arguments, the Court hesitates to adopt Canpotex's reasoning that the parties formed a sufficient contract to bar an unjust enrichment claim, but not so much of a

contract that Aegean can recover in contract.  But again, the Court reaches no conclusion on the issue.

Canpotex also argues that allowing recovery based on unjust enrichment "would be the shortcut to every bunker subcontractor, like Aegean, that could not comply with CIMLA [the U.S. law governing maritime liens]."  Dkt. # 103 at 7.  The Court understands this concern.  But the parties have pointed to no law suggesting that an *in personam* (or *quasi in rem*)[7] claim based on Supplemental Rule B must fail whenever the plaintiff's Supplemental Rule C *in rem* maritime lien claim fails.  As the Fourth Circuit recently explained in *Addax Energy SA v. M/V Yasa H. Mulla*, 987 F.3d 80 (4th Cir. 2021),

> Supplemental Admiralty Rule C expressly accounts for these parallel remedies.  The Rule states that "[e]xcept as otherwise provided by law a party who may proceed in rem may also, or in the alternative, proceed in personam against any person who may be liable."  Fed. R. Civ. P. Supp. R. C(1).  Although a provider of necessaries may pursue both in personam and in rem remedies, the provider may not double-recover on its debt.  Thus, Addax was entitled to pursue both an in personam claim against Windrose and an in rem claim against the vessel to satisfy the maritime debt.

*Id.* at 86 (citation and quotation marks omitted).  So long as the unjust enrichment claim is viable under the applicable law (a question to be determined by reference to Canadian unjust enrichment law), Aegean may pursue this remedy.

In sum, the Court declines to dismiss Aegean's unjust enrichment claim.

---

[7] Supplemental Rule B refers to claims brought "*in personam*."  But as several courts have observed, "[a]lthough Rule B states that it applies to 'an *in personam* action,' Fed. R. Civ. P. Supp. R. B(1), a maritime *in personam* claim is more appropriately styled a *quasi in rem* action."  *DS-Rendite Fonds Nr. 108 VLCC Ashna GMBH & Co Tankschiff KG v. Essar Cap. Americas Inc.*, 882 F.3d 44, 47 (2d Cir. 2018).  "[T]he nature of the jurisdiction the court acquires by a Rule B attachment is properly denominated 'quasi in rem' because any judgment rendered is limited to the value of the attached property."  *Teyseer Cement Co. v. Halla Mar. Corp.*, 794 F.2d 472, 477 (9th Cir. 1986).  Aegean styles its breach of contract and unjust enrichment claims as *quasi in rem* claims.  Given that Rule B *in personam* claims operate more like a *quasi in rem* claim, the Court does not believe that Aegean's labeling of its claims presents an issue.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

F.      Arrest of Bunker Fuel and Maritime Garnishment and Attachment

Aegean asserts two final "causes of action": one for "arrest of all bunkers on board the M/V KAVO PLATANOS," and one for "maritime attachment and garnishment."  Dkt. # 99 at 11–14.  But the Court has already arrested the bunkers and has already issued a writ of attachment and garnishment.  It seems that Aegean simply wants the Court to maintain those positions until it adjudicates the remainder of this case.  And as the Court previously noted, both arguments rise and fall with Aegean's other theories of recovery.  Dkt. # 98 at 19–20.  So it is not clear that these are distinct causes of action, but rather just types of relief.

Canpotex says that these "causes of action" fail because they are based on the existence of a maritime lien.  Dkt. # 100 at 15.  And because the Court has now dismissed Aegean's lien claim, Canpotex says these causes of action fail too.  *Id.*  The Court does not know whether these claims—to the extent they represent distinct causes of action—should be dismissed.  It seems that these claims may rise and fall with Aegean's breach of contract and unjust enrichment claims too, not just its lien claim.  For example, because the Court has not dismissed Aegean's breach of contract claim, it seems that its "arrest" claim—which appears to hinge on title remaining with Aegean in accordance with its terms of service—should not be dismissed.[8]  But the parties are welcome to brief this issue in the future.

G.      Final Observation

This case has been pending for over eight years and involves a dispute over a finite amount of money.  The Court believes that the parties may benefit from settlement discussions.

_____

[8] Aegean confusingly states that its arrest claim does not depend on a finding that its contract terms apply to Canpotex.  Dkt. # 102 at 13.  It suggests that it has a viable claim for "arrest" simply because it "was never paid for the bunkers."  *Id.*  Aegean cites no law for the proposition that in the absence of a contract that entitles it to maintain title, a supplier of necessaries automatically maintains title to delivered bunkers—as a matter of law—whenever it has not been paid.

ORDER - 27

According to the local rules, "the court may appoint a settlement judge who may conduct a settlement conference in such manner as that settlement judge may deem appropriate."   LCR 39.1(e).  If the parties would be interested in holding a settlement conference before a judge of this district, they should inform the Court as soon as possible.

V

Conclusion

For the reasons above, the Court GRANTS the motion to dismiss in part as to the maritime lien claim but DENIES it in part as to all other claims.  Dkt. # 100.

Dated this 18th day of August, 2023.

John H. Chun
United States District Judge